## *Lessee of William Todd *against* Philip [*295 Ockerman and Daniel St. Clair.

A settler under a military permit, does not lose his preference, by omitting to file an application in the land office on the 3d April 1769.

A grantor of lands allowed as a witness under a release, though the date of the deed was not specified therein.

Certificate of surveyor general, that he had issued a special order to a deputy surveyor to survey lands, allowed to be read in evidence, under special circumstances.

EJECTMENT for one messuage and 300 acres of land, in Mount Pleasant township.

The title of the lessor of the plaintiff rested on an application entered in the land office on 3d April 1769, No. 60, in the name of Simon Eaker, for 300 acres of land joining the Chesnut ridge and the Shelving rocks, or otherwise called Pine or Spruce rocks, on the south west side of Loyalhanna, a survey thereon of 279 acres 100 perches and allowance, by Robert McCrea deputy surveyor, of the 17th October 1769, returned in dispute; and divers mesne conveyances, vesting the location and survey in Todd.

The defendants gave in evidence an application entered on the 7th April 1769, No. 2969, by John Grant, for 300 acres, on the Nine Mile run beyond fort Ligonier, joining lands of Arthur St. Clair, who by deed poll dated 10th April 1776, conveyed the same to the said Arthur St. Clair; another application entered on the 23d June 1769, No. 3543, by the said Arthur, for 300 acres on Loyalhanna and the Nine Mile run to the west of the Chesnut ridge, including improvements made by permission of colonel Reid, when commanding officer at fort Pitt; a survey of 609½ acres and allowance on both applications, by John Boyd, deputy surveyor under William Thompson, the easternmost tract surveyed on a special order, in the name of Arthur St. Clair and an application, and the westernmost in the name of John Grant, made on the 15th June 1772; an order of the Board of Property on a *caveat* filed by the said Arthur against the survey made for the said Simon Eaker, directing a patent to issue to the said Arthur on the 3d March 1788; a deed from the said Arthur to his son Daniel for three tracts of land, including that in question, dated 7th July 1788; and a patent to the said Daniel St. Clair in consideration of 82l. 4s. for the said 609½ acres.

To prove the permission of colonel Reid, who commanded to the westward, and which was said to be lost, governor Arthur St. Clair was produced as a witness, together with a release from the said Daniel his son, of all covenants of quiet enjoyment, &c. or warranty, either express or implied, contained in his deed. This release was objected to, because blanks were left in the description of the date of the deed,

[Todd's Lessee v. Ockerman et al.]

as to the day, *month and year; but the objection was overruled, the deed being sufficiently referred to by a general description of the lands therein.

Governor St. Clair being sworn, proved, that he obtained a permission from colonel Reid in 1766, or 1767, to make a settlement on the road to Pittsburgh, at the Nine Mile run from Ligonier, and at Dagworthy's breast works, and to occupy the land between the road and Loyalhanna; that in 1776, he sent this permission, with other valuable papers, from Philadelphia to Carlisle in a trunk, which miscarried by the way, and notwithstanding all his efforts, he had never been able to retrieve it; that in 1767, or 1768, he took possession of these lands, and surveyed and marked all the lines thereof, (which have been since exactly returned in the survey on both applications,) except by the Loyalhanna creek, which possession had continued by himself and his son, and their tenants, to the time of commencing this ejectment, with considerable improvements, except that about six years ago one Patrick Graham privately possessed himself of part of the lands in question, and sometime after ran away. That believing his title under the permission to be good, he did not make an early application to the land office; when the witness saw M'Crea at Ligonier, in the fall of 1769, he shewed him colonel Reid's permission, and requested him to make the survey, but he declined it by reason of Eaker's earlier location, promising however, that he would not make an adverse survey. Understanding however, afterwards, that M'Crea had made a survey in breach of his engagement, for Eaker, the witness complained to governor Penn respecting him in 1770, who thought proper to direct the surveyor general to issue a special order to William Thompson to make the survey. This special order he afterwards saw in Thompson's hands; and at two different subsequent periods, previous to 1788, he applied to John Lukens, esq. the late surveyor general, for a copy of the special order, but on the most careful search, it could not be found. When the hearing was had before the Board of Property, Mr. Lukens being indisposed with the gout, could not attend, but gave a certificate, of which the paper produced is an office copy.

This paper was a certificate of the surveyor general, dated 3d March 1788, that "he had issued an order to William "Thompson to survey these lands for Arthur St. Clair," and was offered in evidence, but was objected to on the following grounds. Because 1st, There was negligence in not searching the surveyor general's office since 1788. 2dly, There was no certificate from the office that the paper was not to be found there. 3dly, The defendant's return of survey specifies no such special *order. 4thly, It is the certificate of a fact. 5thly, It is not upon oath. And lastly, the 3d section of the act of assembly of the 9th April 1781, directs,

[Todd's Lessee v. Ockerman et al.]

that copies of entries, records, and papers of the offices, duly attested by the respective officers, shall be as good evidence as the originals by law might or could be, but the original hereof could not be legal evidence. After full argument of these objections by counsel,

Yeates J. gave his opinion thereon, but previous thereto, it was proved that the special order could not be found amongst Thompson's papers. It is now fully settled, that the rule requiring the best evidence to be produced that the nature of the fact is capable of, is restrained to mean, that no such evidence shall be admitted, which *ex naturâ rei* supposes still greater evidence behind in the party's own power, because of the presumption, that such evidence is against him, or he would produce it. (Gilb. Law: Evid. 16. Bull. 289.) Here proof has been made, that due and reasonable diligence has been used to procure the original special order, both in the surveyor general's office and also amongst William Thompson's papers, and it could not be found. It is said, this proof should be had by a certificate from the surveyor general's office, and not by a stranger. But such certificates will not always be given, lest the paper inquired for might be overlooked on the most careful search. The oath of the party is tantamount, and is attended with this advantage, that the court is enabled to judge from his examination, whether proper pains have been bestowed in the search. It must be remembered, that the proprietaries kept the land office in their own way, and did their business as they thought proper. When the assembly wanted to make it an office of record, during Denny's administration, and the governor passed the law, interest was found in England to procure the royal dissent thereto. The proprietaries were jealous of any one interfering respecting their land office, and considered it as subject to their mere controul. Matters of consequence were frequently transacted by loose notes between the secretary and surveyor general, of which scarce any traces are now to be found. The defendants' return does specify, that the easternmost tract was surveyed on a "special order and an application;" but whether these words refer to the peculiar description of the location No. 3543, calling for the improvements made under the permission of colonel Reid, or the immediate particular direction of the surveyor general, by order of the governor to Thompson, must be submitted to the jury. It seems reasonable, that the same evidence which would satisfy the board of property of the special order of Thompson to sur*vey, should be received here. We sit to revise what they have done. Both Lukens and [*298 Thompson are dead, and cannot be produced. The former gave this certificate officially, and was then a sworn officer. What other testimony of the authority of Thompson can the defendants have in their power to produce, under all the cir-

[Todd's Lessee *v.* Ockerman et al.]

cumstances of this case? The paper offered in evidence, is in fact established by the decision of the board of property and the patent; both those instruments recognize the power of Thompson to make the survey, and I can see no reasonable or legal objection against the reading of the certificate in evidence; but at the same time, as the point has been much insisted on, I shall leave it as a question reserved for the opinion of the court in bank, in case the plaintiff shall think proper eventually to bring it before them.

The certificate was then read in evidence.

Another question was made before the court.

It was insisted on the part of the plaintiff, that Arthur St. Clair, not having entered his application on the 3d April 1769, when the office opened for the lands in the new purchase at fort Stanwix, thereby lost the preference which he otherwise would have had under the permission of colonel Reid; and in the proof thereof, the opinions of the judges of this court in the case of Graham's lessee *v.* Wilson, and Thompson's lessee *v.* Weitzel, both tried in this county, were cited, wherein it was said, that doctrine was sustained.

*E contrà,* for the defendants it was contended, that in the case of the lessee of Croghan's executors *v.* Elliot, tried here in 1790, it was expressly ruled, that one having a permission from the commanding officer to the westward, was not bound to enter his location on the 3d April 1769, being protected by his licence to settle, and the governor's proclamation of 1768.

Yeates J.   I regret that this matter comes before me singly for decision, and more peculiarly so, because until the present circuit, my mind has not been occupied by titles of this nature. Whenever there has been a settled fixed rule of decision, I shall not think myself warranted in infringing it, whatever my private ideas may be on the subject; for endless uncertainty and confusion would thus necessarily ensue. But it seems here admitted by the counsel, that this point has been ruled differently, and therefore it is in some degree left open for further discussion.

The act of assembly of 3d February 1768, contains an express provision in favour of those "who then were, or there-"after might be settled on the main roads or communications "leading *through this province to fort Pitt, under the "approbation and permission of the chief officer com-"manding in the western district to the Ohio for the time "being, for the more convenient accommodation of the sol-"diery and others." The proclamation of governor John Penn, of the 24th February following, recites this law with the same exception. While all others, therefore, were subjected to the penalties of death, for neglecting and refusing to remove from the lands then unpurchased from the Indians,

*299]

[Todd's Lessee *v.* Ockerman et al.]

such settlers with permissions were protected in their possessions, and tacitly encouraged to go on with their improvements. The preamble to the opening of the land office on the 3d April 1769, holds out the same ideas, and expressly declares that "those who had settled plantations, especially "those who had settled by permission of the commanding "officers to the westward, were declared to have a preference, "but those persons who had settled or made what they call "improvements since the purchase, should not thereby ac"quire any advantage." It appears to me, that the settlements without permits entitled to a preference under these words, must necessarily be restricted to those *bonâ fide* improvements which were made prior to 3d February 1768, (the time of passing the law,) and who removed therefrom on the governor's proclamation. There are no words which expressly direct that settlers with permissions shall forfeit their preferences, by not making applications on the day of opening the office. Their rights are secured by an independent clause. Nor in my idea, would any other construction be reasonable or just, or agreeable to the usage and practice of the proprietary land office, as to improvements in the old purchase, or the liberality with which they were accustomed to treat original settlers on vacant lands. These people, under a kind of licence, granted to them as the followers of a camp, or necessary concomitants of an army, defending the western territory, had settled and cultivated farms, at some considerable expence and risque, and received encouragement from the lords of the soil. The strictest rules of justice and fair dealing would demand, that they should have due and convenient notice of a different arrangement, before they should be required to abandon the product of their labours. Suppose a person possessed of a crop of corn in the ground, having a permission to settle, and does not enter his application on the 3d April 1769, shall another who enters his location and gets the same early surveyed before the ensuing harvest, strip him of his property, by an action of mesne profits subsequent to the trial of his ejectment? Every man's feelings will answer in the negative, and will assert that such settlers were sheltered * and protected in their possessions, [*300 under the true spirit and meaning of the foregoing public acts. They operate as implied contracts on the part of the then proprietaries, and give rights of pre-emption, provided applications are made for office rights in due and convenient time. But a day, a week, or a month's notice in the land office is not sufficient for those who are settled some hundred miles from the city, of an intended change of sentiments in the proprietary agents. Such conduct in my apprehension, would be the arbitrary will of one of the contracting parties, without the concurrence of the other. I will not attempt to draw the line, how early the application for an office

right should be made by a settler, under a military permit; it must be governed by the whole circumstances attending each case; but I by no means carry it to the extravagant length that the period of time is to be measured by the mere option of the settler.

Upon the whole, on the best judgment that I have been able to form on the subject before me, I am of opinion, that a settler under a permission of a commanding officer to the westward, does not lose his preference by omitting to apply to the land office on the 3d April 1769; and I am authorised to say that considering it as a mere abstract question, independent of other circumstances, the chief justice entertains the same sentiments.

Verdict for the plaintiff, for the lands contained within his survey.

Messrs. J. Woods and J. Ross, *pro quer.*

Messrs. Hamilton and Brackenridge, *pro def.*